UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

| | |
|---|---|
| JOSEPH CROGNALE, Derivatively on Behalf of UNITEDHEALTH GROUP INCORPORATED, <br><br> Plaintiff, <br><br> v. <br><br> STEPHEN J. HEMSLEY, MICHELE J. HOOPER, TIMOTHY P. FLYNN, VALERIE C. MONTGOMERY RICE, F. WILLIAM MCNABB III, JOHN H. NOSEWORTHY, PAUL R. GARCIA, KRISTEN L. GIL, CHARLES D. BAKER, RICHARD T. BURKE, ANDREW P. WITTY, WILLIAM C. BALLARD, JR., GLENN M. RENWICK, and DAVID S. WICHMANN, <br><br> Defendants, <br><br> -and- <br><br> UNITEDHEALTH GROUP INCORPORATED, a Delaware Corporation, <br><br> Nominal Defendant. | No. <br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br> DEMAND FOR JURY TRIAL |

**VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT FOR VIOLATIONS OF SECURITIES LAW, BREACH OF FIDUCIARY DUTY, AND UNJUST ENRICHMENT**

Plaintiff, by his attorneys, submits this Verified Stockholder Derivative Complaint for Violations of Securities Law, Breach of Fiduciary Duty, and Unjust Enrichment. Plaintiff alleges the following on information and belief, except as to the allegations specifically pertaining to plaintiff which are based on personal knowledge. This complaint is also based on the investigation of plaintiff's counsel, which included, among other things, a review of public filings with the U.S. Securities and Exchange Commission ("SEC") and a review of news reports, press releases, and other publicly available sources.

## NATURE AND SUMMARY OF THE ACTION

1.      This is a stockholder derivative action brought by plaintiff on behalf of nominal defendant UnitedHealth Group Incorporated ("UnitedHealth" or the "Company") against certain of its officers and directors for violations of securities law, breach of fiduciary duties, and unjust enrichment.  These wrongs resulted in significant damages to UnitedHealth's reputation, goodwill, and standing in the business community, as well as exposing the Company to potential liability for violations of state and federal law.

2.      UnitedHealth is a healthcare and well-being company headquartered in Minnesota. The Company operates primarily through two business segments: Optum and UnitedHealthcare. Optum focuses on healthcare services including data analytics, pharmacy benefits, and care delivery.  UnitedHealthcare provides a wide range of health insurance plans for individuals, employers, and government programs, including Medicare Advantage program.  Through these segments, the Company operates a dual structure in which its insurance arm processed claims while its healthcare services arm delivered care.

3.      The Medicare Advantage ("MA") program, also known as Medicare Part C, provides Medicare benefits to eligible individuals through private insurance plans, rather than directly through the federal government, as in the traditional Medicare program (Parts A and B). The MA program allows private insurers to receive capitated payments[1] from the Centers for Medicare & Medicaid Services ("CMS") based on patients' reported health "risk scores."  The higher the risk score, the larger the payment the insurer receives.

---

[1] Capitated payments refer to fixed payments made to a healthcare provider for each patient, intended to cover the anticipated cost of healthcare services over a specified period.

4.      Through its subsidiaries, UnitedHealth's dual structure enabled the Company to carry out an aggressive upcoding scheme.  This scheme aimed to maximize Medicare reimbursements by inflating patients' risk scores based on inaccurate or unsupported diagnostic information.  As part of this plan, the Company submitted materially false claims to CMS, resulting in inflated payments and overcharges to the government, while also failing to correct unsupported diagnoses.  UnitedHealth executed this scheme through a series of improper practices involving medically unnecessary or excessive procedures.

5.      A central component of this strategy was the Company's "HouseCalls" program.  Under HouseCalls, UnitedHealth deployed nurse practitioners to patients' homes to perform physical assessments aimed at identifying new diagnoses.  To increase participation, the Company offered MA plan members incentives, such as gift cards, for completing these in-home visits.  Although UnitedHealth marketed the program as a means of providing care to underserved populations, it became the Company's primary tool to generate additional diagnoses that would raise patients' risk scores and increase Medicare payments.

6.      Other tactics taken to increase risk score adjustments included: (i) pressuring healthcare professionals to add questionable diagnoses; (ii) using software that flagged unsupported health conditions; (iii) implementing a three-step process involving offshore coders to submit inflated claims; and (iv) requiring the use of an unreliable medical device known to generate false positives.

7.      UnitedHealth's Medicare billing scheme represented a core business practice and generated a considerable portion of the Company's revenue.  For example, on July 8, 2024, the *Wall Street Journal* ("*WSJ*") published an article titled "Insurers Pocketed $50 Billion From Medicare for Diseases No Doctor Treated" (the "July 8, 2024 *WSJ* Article").  The article reported

that, in 2021, the Company gained $8.7 billion in revenue from diagnoses for which no physician provided treatment—accounting for more than half of its net income that year. The scheme was fundamentally deceptive, relying on unsupported diagnoses and inflated risk scores that were disconnected from actual patient care to improperly boost Medicare reimbursements. UnitedHealth's billing scheme was so massive, and the coordinated efforts so intricate, that it could not have been executed without UnitedHealth's Board of Directors' (the "Board") knowledge or approval.

8.    These wrongful actions have led to UnitedHealth being sued in an ongoing False Claims Act case, titled, *United States of America v. United Health Group, Inc.*, 2:16-cv-08697 (the "UnitedHealth False Claims Act Case"). Originally filed in 2016, the U.S. Department of Justice ("DOJ") intervened in 2017. The UnitedHealth False Claims Act Case centers on the Company's misconduct involving the submission of false data on chart reviews[2] to improperly inflate MA risk adjustment payments. The UnitedHealth False Claims Act Case placed the Board on explicit notice that the Company's risk adjustment practices posed serious legal and financial risks. Yet despite the ongoing litigation, the Board permitted UnitedHealth to continue engaging in similar deceptive upcoding practices for years, without adopting appropriate corrective measures.

9.    The wrongful practice continued until regulatory reforms forced the Company to curtail its unlawful upcoding practices. The rollback of these practices led to a significant decline in expected revenue through Medicare reimbursements, revealing the extent to which the Company had relied on its improper practices to sustain its financial performance. As a result, in an April 17, 2025, press release, the Company sharply lowered its earnings guidance for the remainder of

---

[2] Chart reviews refer to UnitedHealth's process by which internal reviewers independently review patient files to assign applicable diagnostic codes.

the year.  In the following month, the Company announced that its Chief Executive Officer ("CEO"), Andrew p. Witty ("Witty"), had suddenly resigned from his role.  The Company further stated that it had suspended its previously issued 2025 earnings guidance.  In response to these announcements, the Company's stock price cratered, dropping over 53% in just about a month and resulting in a $281.8 billion loss in market capitalization.

10.     As should have been foreseen, the Company's misconduct drew the attention of the DOJ, the Office of Inspector General at the U.S. Department of Health and Human Services ("OIG"), and other government officials, as well as investigative journalists.  As noted above, UnitedHealth remains the subject of the UnitedHealth False Claims Act Case.  Additionally, on February 27, 2024, the *WSJ* reported that the DOJ had opened a nonpublic investigation into the Company's Medicare billing practices.  Subsequently, on May 14, 2025, the *WSJ* reported that the DOJ was preparing to launch a criminal investigation into UnitedHealth, focusing on potential fraud related to the Company's MA business practices.

11.     While the Individual Defendants (defined *infra*) breached their fiduciary duties by knowingly, recklessly, or through gross negligence engaging in a deceptive billing scheme, certain directors and officers of UnitedHealth also violated section 14(a) of the Securities Exchange Act of 1934 ("Exchange Act") and SEC Rule 14a-9.  They crafted and disseminated materially false and misleading proxy statements, failing to ensure these statements disclosed UnitedHealth's deceptive scheme.  These proxy statements were instrumental in obtaining stockholder approval for a stock incentive plan, as well as an amendment to an employee stock purchase plan.

12.     Further, UnitedHealth's unlawful billing scheme inflated the Company's revenues, earnings, and, as a result, its stock price.  The Individual Defendants further propped up the Company's stock price and concealed the wrongdoing by pushing through multiple stock

repurchases.   Despite knowledge of the Company's issues and challenges, UnitedHealth's fiduciaries caused the Company to spend over $41.4 ***billion*** to repurchase 101,800,000 shares of Company common stock at inflated prices.

13.    While the Company was harmed by the Individual Defendants' misconduct, the Insider Selling Defendants (as defined herein) fared much better.  The Insider Selling Defendants sold UnitedHealth stock at artificially inflated prices based on their knowledge of material, nonpublic information.  In sum, these insiders collectively sold over $480 million worth of UnitedHealth stock at inflated prices, capitalizing on their possession of material nonpublic information.

<u>**JURISDICTION AND VENUE**</u>

14.    This Court has jurisdiction under 28 U.S.C. §1331 because certain of the claims asserted herein arise under section 10(b) of the Exchange Act and Rule 10b-5 (17 C.F.R. §240.10b-5) promulgated thereunder by the SEC.  The Court has supplemental jurisdiction over the remaining claims asserted herein under 28 U.S.C. §1367(a).

15.    This Court has jurisdiction over each defendant named herein because each defendant is either a corporation that conducts business in and maintains operations in this District, or is an individual who has sufficient minimum contacts with this District to render the exercise of jurisdiction by the District courts permissible under traditional notions of fair play and substantial justice.

16.    Venue is proper in this Court in accordance with 28 U.S.C. §1391 because: (i) UnitedHealth maintains its principal place of business in this District; (ii) one or more of the defendants either resides in or maintains executive offices in this District; (iii) a substantial portion of the transactions and wrongs complained of herein, including the defendants' primary

participation in the wrongful acts detailed herein, in violation of fiduciary duties owed to UnitedHealth, occurred in this District; and (iv) defendants have received substantial compensation in this District by doing business here and engaging in numerous activities that had an effect in this District.

## THE PARTIES

**Plaintiff**

17.    Plaintiff Joseph Crognale was a stockholder of UnitedHealth at the time of the wrongdoing complained of, has continuously been a stockholder since that time, and is a current UnitedHealth stockholder.

**Nominal Defendant**

18.    Nominal defendant UnitedHealth is a Delaware Corporation with principal executive offices located at 1 Health Drive Eden Prairie, Minnesota 55344 and 655 New York Avenue NW Washington, DC 20001.  UnitedHealth is a healthcare and well-being company. UnitedHealth's operates through two businesses—Optum and UnitedHealthcare.  Optum serves the broad healthcare marketplace, including patients and consumers, payers, care providers, employers, governments and life sciences companies, through its Optum Health, Optum Insight and Optum Rx businesses.   UnitedHealthcare offers a full range of health benefits. UnitedHealthcare Employer & Individual serves consumers and employers, ranging from sole proprietorships to large, multi-site and national employers and public sector employers. UnitedHealthcare Medicare & Retirement delivers health and well-being benefits to seniors and other Medicare eligible consumers.  UnitedHealthcare Community & State serves consumers who are economically disadvantaged, the medically underserved and those without the benefit of

employer sponsored health benefits coverage.  As of December 31, 2024, UnitedHealth had nearly 400,000 employees.

**Defendants**

19.    Defendant Stephen J. Hemsley ("Hemsley") has been UnitedHealth's CEO since May 2025; Chair of the Board since November 2019 and a director since 2000.  Defendant Hemsley was also UnitedHealth's Executive Chair of the Board from September 2017 to November 2019; CEO from November 2006 to August 2017; President from May 1999 to November 2014; Chief Operating Officer ("COO") from September 1998 to November 2006; and Senior Executive Vice President and also a member of the Office of the Chairman from June 1997 to September 1998.   While in possession of material, nonpublic information concerning UnitedHealth's true business health, defendant Hemsley sold 854,124 shares of his personally held stock for $351.5 million in proceeds.   UnitedHealth paid defendant Hemsley the following compensation as a director:

| Fiscal Year | Stock Awards | All Other Compensation | Total |
|---|---|---|---|
| 2023 | $571,168 | $24,180 | $595,348 |
| 2022 | $555,782 | $24,058 | $579,840 |
| 2021 | $550,700 | $23,928 | $574,628 |
| 2020 | $534,818 | $22,977 | $557,795 |
| 2019 | - | $735 | $735 |

20.    Defendant Michele J. Hooper ("Hooper") has been UnitedHealth's Lead Independent Director since October 2021 and a director since October 2007.  Defendant Hooper was a member of the Audit and Finance Committee from at least April 2019 to at least April 2023.  UnitedHealth paid defendant Hooper the following compensation as a director:

- 8 -

| Fiscal Year | Fees Paid in Cash | Stock Awards | All Other Compensation | Total |
|---|---|---|---|---|
| 2023 | $200,000 | $225,961 | $15,558 | $441,519 |
| 2022 | $200,000 | $211,082 | $15,558 | $426,640 |
| 2021 | $145,000 | $205,573 | $15,521 | $366,094 |
| 2020 | $145,000 | $205,592 | $15,361 | $365,953 |
| 2019 | $145,000 | $205,395 | $15,505 | $365,900 |

21.    Defendant Timothy P. Flynn ("Flynn") has been a UnitedHealth director since January 2017. UnitedHealth paid defendant Flynn the following compensation as a director:

| Fiscal Year | Stock Awards | All Other Compensation | Total |
|---|---|---|---|
| 2023 | $376,050 | $24,112 | $400,162 |
| 2022 | $357,121 | $23,438 | $380,559 |
| 2021 | $351,182 | $23,168 | $374,350 |
| 2020 | $339,962 | $22,331 | $362,293 |
| 2019 | $330,325 | $22,847 | $353,172 |

22.    Defendant Valerie C. Montgomery Rice ("Rice") has been a UnitedHealth director since August 2017. UnitedHealth paid defendant Rice the following compensation as a director:

| Fiscal Year | Fees Paid in Cash | Stock Awards | All Other Compensation | Total |
|---|---|---|---|---|
| 2023 | - | $376,050 | $15,000 | $391,050 |
| 2022 | - | $355,591 | $15,000 | $370,591 |
| 2021 | $39,061 | $291,813 | $33,100 | $363,974 |
| 2020 | $78,125 | $252,390 | $18,543 | $349,058 |
| 2019 | $125,000 | $205,395 | $16,321 | $346,716 |

23.    Defendant F. William McNabb III ("McNabb") has been a UnitedHealth director since February 2018. Defendant McNabb has been Chair of the Audit and Finance Committee since at least April 2022, and a member of the committee since at least April 2019. UnitedHealth paid defendant McNabb the following compensation as a director:

| Fiscal Year | Stock Awards | All Other Compensation | Total |
|---|---|---|---|
| 2023 | $383,639 | $9,244 | $392,883 |
| 2022 | $363,315 | $9,122 | $372,437 |
| 2021 | $338,682 | $8,987 | $347,669 |
| 2020 | $330,784 | - | $330,784 |
| 2019 | $330,325 | - | $330,325 |

24.     Defendant John H. Noseworthy ("Noseworthy") has been a UnitedHealth director since February 2019.  UnitedHealth paid defendant Noseworthy the following compensation as a director:

| Fiscal Year | Stock Awards | All Other Compensation | Total |
|---|---|---|---|
| 2023 | $376,050 | $15,000 | $391,050 |
| 2022 | $357,121 | $15,000 | $372,121 |
| 2021 | $330,787 | $10,000 | $340,787 |
| 2020 | $330,784 | $15,000 | $345,784 |
| 2019 | $209,477 | $11,817 | $221,294 |

25.     Defendant Paul R. Garcia ("Garcia") has been a UnitedHealth director since November 2021.  Defendant Garcia has been a member of the Audit and Finance Committee since at least April 2022.  UnitedHealth paid defendant Garcia the following compensation as a director:

| Fiscal Year | Stock Awards | All Other Compensation | Total |
|---|---|---|---|
| 2023 | $351,800 | $15,000 | $366,800 |
| 2022 | $336,994 | $15,000 | $351,994 |
| 2021 | - | $15,000 | $15,000 |

26.     Defendant Kristen L. Gil ("Gil") has been a UnitedHealth director since December 2022.  Defendant Gil has been a member of the Audit and Finance Committee since at least April 2023.  UnitedHealth paid defendant Gil the following compensation as a director:

| Fiscal Year | Stock Awards | Total |
|---|---|---|
| 2023 | $351,800 | $351,800 |
| 2022 | $22,302 | $22,302 |

- 10 -

27.    Defendant Charles D. Baker ("Baker") has been a UnitedHealth director since November 2023.  Defendant Baker has been a member of the Audit and Finance Committee since at least April 2024.  UnitedHealth paid defendant Baker the following compensation as a director:

| Fiscal Year | Stock Awards | Total |
|---|---|---|
| 2023 | $59,327 | $59,327 |

28.    Defendant Richard T. Burke ("Burke") was UnitedHealth's Lead Independent Director from September 2017 to June 2022; Chairman of the Board from October 2006 to August 2017; a director from 1977 to June 2022; and CEO of UnitedHealthcare, Inc. from 1977 to 1988. While in possession of material, nonpublic information concerning UnitedHealth's true business health, defendant Burke sold 340,000 shares of his stock for $110.2 million in proceeds. UnitedHealth paid defendant Burke the following compensation as a director:

| Fiscal Year | Fees Earned or Paid in Cash | Stock Awards | All Other Compensation | Total |
|---|---|---|---|---|
| 2022 | $54,298 | $89,547 | $28,667 | $172,512 |
| 2021 | $200,000 | $205,573 | $28,254 | $433,827 |
| 2020 | $200,000 | $205,592 | $27,042 | $432,634 |
| 2019 | $200,000 | $205,395 | $28,006 | $433,401 |

29.    Defendant Witty was a UnitedHealth director from June 2021 to May 2025, and from August 2017 to March 2018; CEO from February 2021 to May 2025; President from November 2019 to February 2021; and CEO of Optum from July 2018 to April 2021.  While in possession of material, nonpublic information concerning UnitedHealth's true business health, defendant Witty sold 27,536 shares of his stock for $13.5 million in proceeds.  UnitedHealth paid defendant Witty the following compensation as an executive:

| Year | Salary | Bonus | Stock Awards | Option Awards | Non-Equity Incentive Plan Compensation | All Other Compensation | Total |
|------|--------|-------|--------------|---------------|----------------------------------------|------------------------|-------|
| 2023 | $ 1,500,000 | - | $15,000,970 | $5,000,114 | $  1,800,000 | $    233,852 | $23,534,936 |
| 2022 | $ 1,500,000 | - | $12,375,672 | $4,125,100 | $  2,760,000 | $    104,334 | $20,865,106 |
| 2021 | $ 1,450,769 | - | $10,781,573 | $3,593,777 | $  2,550,000 | $     57,024 | $18,433,143 |
| 2020 | $    418,846 | $  550,000 | $  8,025,223 | $2,675,007 | $    920,000 | $    268,100 | $12,857,176 |
| 2019 | $ 1,100,000 | $       - | $  9,375,614 | $3,125,046 | $  2,750,000 | $    175,360 | $16,526,020 |

30.     Defendant William C. Ballard, Jr. ("Ballard") was a UnitedHealth director from 1993 to June 2020.  While in possession of material, nonpublic information concerning UnitedHealth's true business health, defendant Ballard sold 22,000 shares of his stock for $5.5 million in proceeds.  UnitedHealth paid defendant Ballard the following compensation as a director:

| Fiscal Year | Fees Paid in Cash | Stock Awards | All Other Compensation | Total |
|-------------|-------------------|--------------|------------------------|-------|
| 2020 | $94,507 | $137,873 | $11,778 | $244,158 |
| 2019 | $145,000 | $205,395 | $18,433 | $368,828 |

31.     Defendant Glenn M. Renwick ("Renwick") was a UnitedHealth director from June 2008 to June 2021.  Defendant Renwick was Chair and a member of UnitedHealth's Audit and Finance Committee from at least April 2019 to at least April 2021.  UnitedHealth paid defendant Renwick the following compensation as a director:

| Fiscal Year | Stock Awards | All Other Compensation | Total |
|-------------|--------------|------------------------|-------|
| 2021 | $244,006 | $4,494 | $248,500 |
| 2020 | $355,611 | $23,037 | $378,648 |
| 2019 | $355,404 | $23,874 | $379,278 |

32.     Defendant David S. Wichmann ("Wichmann") was a UnitedHealth director and CEO from September 2017 to February 2021; President from November 2014 to August 2017; Chief Financial Officer from January 2011 to June 2016; Executive Vice President and President of UnitedHealth Group Operations and Technology from April 2008 to November 2014; Executive Vice President and President of the Commercial Markets Group from December 2006 to April

2008; President and COO of the Commercial Markets Group from July 2004 to December 2006; President and CEO of Specialized Care Services from 2002 to July 2004; and Senior Vice President of Corporate development from 1998 to 2004. UnitedHealth paid defendant Wichmann the following compensation as an executive:

| Year | Salary | Stock Awards | Option Awards | Non-Equity Incentive Plan Compensation | All Other Compensation | Total |
|------|--------|--------------|---------------|----------------------------------------|------------------------|-------|
| 2021 | $393,077 | - | - | - | $10,828,016 | $11,221,093 |
| 2020 | $1,400,000 | $9,600,592 | $3,200,038 | $3,500,000 | $172,083 | $17,872,713 |
| 2019 | $1,384,615 | $9,600,348 | $3,200,033 | $4,500,000 | $201,993 | $18,886,989 |

33.     The defendant identified in ¶17 is referred to herein as the "Officer Defendant." The defendants identified in ¶¶18-30 are referred to herein as the "Director Defendants." The defendants identified in ¶¶18, 21, 23-25, 29 are referred to herein as the "Audit Committee Defendants." The defendants identified in ¶¶17, 26-28 are referred to herein as the "Insider Selling Defendants." Collectively, the defendants identified in ¶¶17-30 are referred to herein as the "Individual Defendants."

## DUTIES OF THE INDIVIDUAL DEFENDANTS

**Fiduciary Duties**

34.     By reason of their positions as officers and directors of the Company, each of the Individual Defendants owed and owe UnitedHealth and its stockholders fiduciary obligations of care and loyalty, and were and are required to use their utmost ability to control and manage UnitedHealth in a fair, just, honest, and equitable manner. The Individual Defendants were and are required to act in furtherance of the best interests of UnitedHealth and not in furtherance of their personal interest or benefit.

35.     To discharge their duties, the officers and directors of UnitedHealth were required to exercise reasonable and prudent supervision over the management, policies, practices, and controls of the Company.  By virtue of such duties, the officers and directors of UnitedHealth were required to, among other things:

(a)     provide truthful and accurate information regarding UnitedHealth's business operations and regulatory compliance;

(b)     conduct the affairs of the Company in an efficient, business-like manner in compliance with all applicable laws, rules, and regulations so as to make it possible to provide the highest quality performance of its business and to maximize the value of the Company's stock;

(c)     prioritize the interests of UnitedHealth and its stockholders over their own personal financial interests; and

(d)     remain informed as to how UnitedHealth conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, make reasonable inquiry in connection therewith, and take steps to correct such conditions or practices and make such disclosures as necessary to comply with applicable laws.

**Breaches of Duties**

36.     The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as officers and directors of UnitedHealth, the absence of good faith on their part, and a reckless disregard for their duties to the Company that the Individual Defendants were aware or reckless in not being aware posed a risk of serious injury to the Company.

37.     The Individual Defendants breached their duty of loyalty by allowing defendants to cause, or by themselves causing, UnitedHealth to engage in a deceptive MA billing scheme to maximize its profits.

38.     Additionally, the Individual Defendants breached their duty of loyalty by allowing defendants to cause, or by themselves causing, the Company to omit materials facts, including, among other things, the failure to disclose that: (i) UnitedHealth engaged in an aggressive billing scheme, often based on incomplete or unsupported diagnoses, in order to maximize profit; (ii) the Company's business practices were not in compliance with regulatory standards.

39.     The Individual Defendants, because of their positions of control and authority as officers and/or directors of UnitedHealth, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein.  The Individual Defendants also failed to prevent the other Individual Defendants from taking such wrongful actions.  The Insider Selling Defendants used their knowledge of UnitedHealth's material and nonpublic information to sell hundreds of millions of dollars' worth of their personal holdings, all while the price of the Company's common stock was artificially inflated by the Individual Defendants' omissions.  As a result, and in addition to the damage the Company has already incurred, UnitedHealth has expended, and will continue to expend, significant sums of money.

**Additional Duties of the Audit Committee Defendants**

40.     In addition to these duties, the Audit Committee Defendants, defendants Hooper, McNabb, Garcia, Gil, Baker, and Renwick, owed specific duties to UnitedHealth to assist the Board in overseeing: (i) the conduct and integrity of the Company's financial reporting to any governmental or regulatory body, the public or other users thereof; (ii) the Company's compliance with legal and regulatory requirements including privacy, cybersecurity and data protection; and

(iii) the efficacy of the Company's enterprise risk management structure and key processes.

41.     Moreover, the Audit Committee's Charter provides the Audit Committee Defendants were specifically required to review, among other things, with management: (i) earnings press releases, as well as financial information and earnings guidance provided to analysts and rating agencies; (ii) the Company's enterprise risk management framework, including the governance structure, the guidelines and policies for assessing, identifying, managing, monitoring and reporting of significant risks; (iii) the Company's significant risks and the steps management has taken to monitor, control, or mitigate such risks; (iv) the effectiveness of the Company's policies, procedures and resource commitment in the areas of compliance, ethics, and privacy, by interacting with the leadership and management responsible for these functions; (v) reports from the Chief Compliance and Ethics Officer regarding compliance with its Code of Business Conduct and Ethics and Principles of Ethics and Integrity; and (vi) periodic reports regarding matters relating to the Company's compliance with legal and regulatory requirements from the Chief Compliance and Ethics Officer, who has express authority to communicate directly with the Committee as necessary.

**Additional Duties Under the Company's Code of Conduct**

42.     In addition to the duties outlined above, the Individual Defendants were bound by the Company's Code of Conduct (the "Code").  The Code specifically states that all employees and directors are accountable for: (i) complying with all applicable laws and regulations; and (ii) preventing fraud, waste, and abuse in the health care system.

43.     Additionally, with respect to insider trading, the Code provides that employees and directors may not: (i) use or disclose to others material, nonpublic information about UnitedHealth or another company as the basis for buying or selling stock; (ii) use Company property,

information, or other position with the Company to take advantage of corporate opportunities for personal gain, unless the opportunity was first presented to and rejected by the Company, and doing so will not involve competition with the Company's business activities.

## SUBSTANTIVE ALLEGATIONS

### UnitedHealth Exploits Its Vertical Integration to Maximize Medicare Reimbursements

44.     The Company operates primarily through two key business segments: Optum and UnitedHealthcare.  Optum focuses on healthcare services including data analytics, pharmacy benefits, and care delivery.  UnitedHealthcare provides a wide range of health insurance plans for individuals, employers, and government programs.   UnitedHealthcare is composed of the following three divisions: Employer & Individual, Medicare & Retirement, and Community & State.  The Medicare & Retirement division provides health and well-being benefits to seniors and other Medicare eligible consumers.  In 2024, the Medicare & Retirement division accounted for nearly half of UnitedHealthcare's revenue:

*UnitedHealthcare*

The following table summarizes UnitedHealthcare revenues by business:

| (in millions, except percentages) | For the Years Ended December 31, | | | Change | |
| --- | --- | --- | --- | --- | --- |
| | 2024 | 2023 | 2022 | 2024 vs. 2023 | |
| UnitedHealthcare Employer & Individual - Domestic | $ 74,489 | $ 67,187 | $ 63,599 | $ 7,302 | 11 % |
| UnitedHealthcare Employer & Individual - Global | 3,667 | 9,307 | 8,668 | (5,640) | (61) |
| UnitedHealthcare Employer & Individual - Total | 78,156 | 76,494 | 72,267 | 1,662 | 2 |
| UnitedHealthcare Medicare & Retirement | 139,482 | 129,862 | 113,671 | 9,620 | 7 |
| UnitedHealthcare Community & State | 80,570 | 75,004 | 63,803 | 5,566 | 7 |
| Total UnitedHealthcare revenues | $ 298,208 | $ 281,360 | $ 249,741 | $ 16,848 | 6 % |

Since 2021, the Medicare & Retirement division represented more than one-third of the Company's consolidated revenue across all reporting segments.

45.     Under the MA program, Medicare beneficiaries can choose to receive their Medicare benefits from private insurance companies approved by CMS through MA plans.  Under this model, insurers offering MA plans receive a fixed per-member payment, adjusted for each

beneficiary's health risk profile.  CMS calculates risk scores using diagnosis codes reported by insurers.  As part of the program, the risk adjustment mechanism increases insurer reimbursements based on the reported health status of patients.  The addition of diagnoses raises patients' risk scores, which in turn increases the payments insurers receive.

46.     While UnitedHealthcare served as the insurance arm, Optum Health—its healthcare provider segment—functioned as the care delivery entity.  By operating within this closed loop, UnitedHealth controlled the payment of claims through its insurance division and also influenced the submission of diagnoses and exerted control over documentation and upcoding practices.  As a result of this dual role, the Company had both the incentive and the opportunity to increase risk scores and maximize its Medicare reimbursements.

**UnitedHealth Employs Various Tactics to Generate Additional Patient Diagnoses**

47.     UnitedHealth's vertically integrated structure allowed it to systematically inflate risk scores and increase reimbursements beyond what was warranted by patients' actual health conditions.  The Company achieved this through a series of improper practices: (i) pressuring healthcare practitioners to add questionable diagnoses; (ii) using software that flagged unsupported health conditions; (iii) implementing a three-step process involving offshore coders to submit inflated claims; and (iv) requiring the use of an unreliable medical device known to generate false positives.

48.     UnitedHealth's HouseCalls program operates within the Company's insurance arm and is designed to provide in-home clinical assessments for patients.  Through the program, healthcare practitioners, typically nurse practitioners, visit patients' homes to conduct health risk assessments.  To encourage participation, UnitedHealth offered gift cards and other incentives to members who completed these visits.  For instance, the July 8, 2024 *WSJ* Article reported that a

former UnitedHealth MA member was offered a $50 gift card to participate in an in-home assessment.  While these incentives increased participation, they also facilitated the Company's broader efforts to maximize revenue.  In an effort to maximize revenue, UnitedHealth employed various tactics to inflate patient risk scores and secure higher payments from CMS.

49.     For instance, the Company implemented training programs that pressured healthcare professionals to generate additional diagnoses.  On December 29, 2024, the *WSJ* published a report titled "UnitedHealth's Army of Doctors Helped It Collect Billions More From Medicare."  The article quoted a UnitedHealth physician describing the coercive culture: "You're just encouraged to, because obviously, if you don't, they come bothering you[.]"  On October 16, 2024, a *STAT News* report further corroborated the Company's practice of pressuring healthcare professionals to generate additional diagnoses.  The report quoted a former UnitedHealth physician stating: "They would say, 'You should talk about these other high-risk disease states so that we get more compensation for it.'"  Another former UnitedHealth physician recalled, "Clinicians would strategize about how to talk corporate managers off overly ambitious goals for diagnosing more chronic conditions and increasing patients' risk scores to fetch more money from Medicare."

50.     At the same time, HouseCalls nurses were directed to strictly limit the scope of in-home visits.  For instance, nurses were not permitted to provide direct medical treatment, issue prescriptions, or initiate specialist referrals.  As a result, these in-home assessments often produced diagnoses without any follow-up care.  The primary purpose of the visits was to compile an extensive checklist of questionable diagnoses.

51.     The July 8, 2024 *WSJ* Article described a HouseCalls visit during which a nurse diagnosed a patient with minor cataracts attributed to diabetes, noting that the condition was severe enough to cause nerve damage.  The patient's primary care physician later confirmed—based on

the patient's medical history and follow-up blood tests—that the patient had never had diabetes. Reflecting on the incident, the physician remarked that the Company's upcoding practices were "all just so wrong."

52.     In another example, on March 18, 2024, *The Examiner News* (the "March 18, 2024 *The Examiner News* Article") published an article titled, "Whistleblower Releases Audio, Files Complaint: Cites Medical Billing Plot at Optum."   The article reported that UnitedHealth executives coached nurses into applying "buddy codes"—additional diagnosis codes added to a patient's record to artificially inflate the risk score.   In response to a nurse's request for resources clarifying the codes, a physician—who also held a management role—implied that the codes were, at least in part, fabricated and added, "No one else will know what you're talking about outside of this room[.]"

53.     As revealed in an article published by the *WSJ* on February 21, 2025, titled "DOJ Investigates Medicare Billing Practices at UnitedHealth[,]" the Company "also used software to suggest conditions and paid bonuses for considering the suggestions, among other tactics, according to the doctors."   The software guided nurses toward generating diagnoses in ways that inflated risk scores, allowing the Company to maximize Medicare reimbursements.

54.     On August 4, 2024, the *WSJ* published an article titled "The One-Hour Nurse Visits That Let Insurers Collect $15 Billion From Medicare" (the "August 4, 2024 *WSJ* Article").   The article reported that the software routinely suggested rare and high-value diagnoses.   For example, a former HouseCalls nurse recalled that the software prompted a diagnosis of hyperaldosteronism—a condition rarely identified in traditional Medicare patients—stating, "In a million years, I wouldn't have come up with a diagnosis of secondary hyperaldosteronism[.]" Notably, nurses were not required to confirm such diagnoses through additional laboratory testing.

Over the three-year period analyzed by the *WSJ*, this particular diagnosis appeared 246,000 times during in-home visits, generating $450 million in Medicare payments.

55.    Next, the March 18, 2024, *The Examiner News* Article explained that the Company employed a "three-step process" to maximize reimbursements.  The first step involved reviewing patient charts to identify previously documented conditions that could be reclassified as active health issues.  Second, the Company "inoculated" providers from liability by closing and locking patients notes after completing "treatment."  Lastly, an offshore coder would add diagnosis codes initially entered by a nurse but not addressed during the physician's visit, then submit these codes as part of Medicare claims.

56.    Finally, UnitedHealth also required nurses to use QuantaFlo, a medical device used to aid clinicians in diagnosing peripheral artery disease.  The August 4, 2024 *WSJ* Article reported that the U.S. Food and Drug Administration had clarified the device "is not indicated for use as a stand-alone diagnostic device but as an adjunct to the diagnostic process."  However, HouseCalls training materials instructed nurses to diagnose peripheral artery disease solely based on the results of the QuantaFlo test.  The August 4, 2024 *WSJ* Article also revealed that, between 2019 and 2021, UnitedHealth's nurses diagnosed peripheral artery disease 568,000 times following in-home visits, generating nearly $1.4 billion in additional payments—nearly $640 million above the total received by all other MA insurers combined.

57.    Healthcare professionals have also reported that QuantaFlo is unreliable and prone to generating false positives.  In fact, on April 16, 2025, *STAT News* reported that Semler Scientific, Inc., the manufacturer of QuantaFlo, "offered to pay the Department of Justice nearly $30 million to settle federal health care fraud claims related to its peripheral artery disease test, QuantaFlo—a product used by UnitedHealth Group and other large insurers."  However, the

Company directed providers to use QuantaFlo regardless of whether patients exhibited any symptoms of peripheral artery disease.

58.     UnitedHealth's deceptive tactics generated billions of dollars in revenue.   The August 4, 2024 *WSJ* Article revealed that, between 2019 and 2021, the Company instructed nurses to conduct additional tests and assign questionable diagnoses, generating an average of $1,818 in additional revenue per home visit.  The article also noted that the Company's average payment for home-visit diagnoses was significantly higher than that of other insurers.  UnitedHealth reported an average payment of $2,735 per member, compared to $1,525 reported by the next largest provider, Humana.

**UnitedHealth's Deceptive Billing Practices Continue Despite Ongoing Legal Exposure and Government Oversight**

59.     UnitedHealth has a history of manipulating diagnostic codes to inflate Medicare reimbursements.  The ongoing UnitedHealth False Claims Act Case, filed in 2016, underscores the Individual Defendants' knowledge of the Company's longstanding deceptive upcoding practices.  The UnitedHealth False Claims Act Case placed the Company's core upcoding practices under direct scrutiny and exposed the Company to significant legal and financial risk.  This ongoing litigation was repeatedly disclosed in the Company's SEC filings.

60.     For instance, on February 13, 2018, UnitedHealth filed its Annual Report on Form 10-K for the fiscal year ended December 31, 2017 (the "2017 Form 10-K") with the SEC.  The 2017 Form 10-K, signed by defendants Hemsley, Hooper, Flynn, Rice, Burke, Witty, Ballard, Renwick, and Wichmann explicitly references the UnitedHealth False Claims Act Case.   In particular, the 2017 Form 10-K stated:

> On February 14, 2017, the Department of Justice (DOJ) announced its decision to pursue certain claims within a lawsuit initially asserted against the Company and filed under seal by a whistleblower in 2011.  The whistleblower's complaint, which was unsealed on February 15, 2017, alleges that the Company, along with a number

of other Medicare Advantage plans, made improper risk adjustment submissions
and violated the False Claims Act.  On March 24, 2017, DOJ intervened in a
separate lawsuit initially asserted against the Company and filed by a whistleblower
in 2009 concerning risk adjustment submissions by Medicare Advantage plans.

UnitedHealth continued to reference the UnitedHealth False Claims Act Case in each of its

subsequent Annual Reports.

61.    This litigation served as a clear red flag that should have alerted the Board to the

severity of UnitedHealth's deceptive billing practices.  Despite the heightened exposure and

ongoing proceedings, the Board permitted the Company to continue engaging in similar deceptive

upcoding practices for years.

62.    UnitedHealth's predatory practices have also caught the attention of government

agencies and officials.  For instance, in September 2021, the OIG published a report disclosing

that twenty Medicare insurers were flagged for receiving approximately half of a $9.2 billion pool

of potentially improper payments from CMS.  OIG investigators found that one insurer received

approximately 40% of the risk-adjusted payments in question, despite accounting for only 22% of

MA beneficiaries.  Although the report did not identify the company by name, multiple

publications reported that UnitedHealth was the entity referenced in the OIG's findings.  The *WSJ*

reported that analysts at BMO Capital Markets were able to match federal data with UnitedHealth's

enrollment share.  As a result of the findings, the OIG recommended that CMS should perform

oversight of the companies that received a disproportionate share of the risk-adjusted payments.

63.    Then, on October 10, 2023, the DOJ notified UnitedHealth that it was the subject

of a nonpublic investigation.  However, the investigation did not become public knowledge until

February 27, 2024, when the *WSJ* published a report titled "U.S. Opens UnitedHealth Antitrust

Probe."  The article revealed that the DOJ's investigation would also examine the Company's

Medicare billings practices, including its methods for documenting patients' medical conditions.

64.     Just a few years after its September 2021 report, the OIG released a follow-up highlighting UnitedHealth's continued wrongdoing through 2023.  In October 2024, the OIG released a report titled "Medicare Advantage: Questionable Use of Health Risk Assessments Continues to Drive Up Payments to Plans by Billions."  In its report, the OIG found that twenty MA companies "generated 80 percent ($6 billion of $7.5 billion) of the estimated 2023 risk-adjusted payments from [Health Risk Assessments ("HRAs")] and HRA-linked chart reviews while covering only half of MA enrollees."  The OIG's report further emphasized that, among the twenty companies analyzed, UnitedHealth stood out from its peers, having reaped over $3.7 billion in estimated risk-adjusted payments through the use of HRAs and related chart reviews.

65.     On February 25, 2025, the *WSJ* published a report titled "U.S. Senator Grassley Launches Inquiry Into UnitedHealth Medicare Billing."  The article reported that Senator Grassley demanded detailed records from UnitedHealth concerning its compliance program, in light of reports of questionable billing practices.

66.     Finally, on May 14, 2025, the *WSJ* reported in an article titled "UnitedHealth Under Criminal Probe for Possible Medicare Fraud," that the DOJ is preparing to launch a criminal investigation into the Company's MA business practices.

67.     The continued use of improper risk adjustment practices, as described above, led to the receipt of billions of dollars in inflated Medicare reimbursements.  Despite numerous red flags, these practices persisted through at least 2023, and likely continued into 2024.

**The Scale and Visibility of the HouseCalls Program Demonstrate the Individual Defendants' Awareness of the Scheme**

68.     The reasonable inference is that the Individual Defendants were fully aware of the Company's deceptive billing scheme.  As noted above, Medicare billing practices were central to UnitedHealth's operations, generating billions of dollars in revenue and representing a significant

portion of the Company's earnings.  Healthcare professionals were also systematically directed to engage in upcoding and other manipulative practices designed to inflate patient risk scores and maximize Medicare reimbursements.

69.     Additionally, UnitedHealth's Annual Reports included a performance metric reflecting that the Company closely monitored the number of in-home visits conducted through its HouseCalls program.  The sustained focus on the program's growth and expansion highlights the Individual Defendants' awareness of the scheme.  For example, on March 1, 2021, UnitedHealth filed its Annual Report on Form 10-K for the fiscal year December 31, 2020 (the "2020 Form 10-K").  The 2020 Form 10-K, signed by defendants Hemsley, Hooper, Flynn, Rice, McNabb, Noseworthy, Renwick, Burke, and Witty, reported that "through our HouseCalls program, nurse practitioners performed nearly 1.7 million preventative case visits in 2020 to address unmet care opportunities and close gaps in care."  UnitedHealth continued to disclose this metric in subsequent reports, reflecting a significant year-over-year increase in visits.  The Company reported approximately 2.1 million, 2.3 million, 2.7 million, and 2.9 million HouseCalls visits for fiscal years 2021, 2022, 2023, and 2024 respectively.  Notably, UnitedHealth continued its use of these practices even after multiple articles and reports had highlighted concerns regarding the Company's improper practices.

**Medicare Advantage Issues Undermine UnitedHealth's Stability and Investor Confidence**

70.     The Company has suffered materially as a result of increasing government and regulatory scrutiny stemming from the Individual Defendants' misconduct.  In particular, on April 17, 2025, UnitedHealth issued a press release announcing a nearly 12% reduction in its 2025 adjusted earnings forecast from the projection initially released in December 2024 and reaffirmed the following month.  The revised forecast reflected the financial impact of the Company's shift away from its billing practices under regulatory reform.

71.     That same day, UnitedHealth held an earnings call with analysts and investors to discuss its financial results for the first quarter ended March 31, 2025.  During the call, defendant Witty admitted that the reduction was primarily driven by issues with the Company's MA segment. Defendant Witty highlighted that there was an increase in Medicare patients seeking medical care. At the same time, UnitedHealth contended with regulatory reforms aimed at curbing abusive Medicare upcoding practices.  As a result, UnitedHealth experienced rising medical expenses driven by higher patient demand, without the financial cushion previously provided by its deceptive billing practices.

72.     The disclosure decimated UnitedHealth's stock price, causing it to plunge 27.3%, or $159.71 per share, over the course of two trading days, falling from the closing price of $585.04 per share on April 16, 2025, to the closing of $425.33 per share on April 18, 2025, erasing over $144.8 billion in market capitalization.

73.     Next, on May 13, 2025, UnitedHealth issued a press release announcing that defendant Witty had abruptly resigned as the Company's CEO and that defendant Hemsley would assume the position.  The press release further stated that the Company had suspended its previously issued 2025 earnings guidance, underscoring ongoing operational challenges and continued reputational decline.

74.     On this news, the Company's stock price plummeted nearly 18%, or $67.37 per share, on May 13, 2025, to close at $311.38 per share compared to the previous trading day's closing of $378.75 per share, erasing over $61.1 billion in market capitalization.

75.     Finally, on May 14, 2025, the *WSJ* published a report titled "UnitedHealth Group is Under Criminal Investigation for Possible Medicare Fraud."  The report stated that the DOJ would focus on the Company's methods of triggering higher Medicare payments.

76.     On this news, UnitedHealth's stock price dropped nearly 11%, or $33.76 per share, on May 15, 2025, to close at $274.35 per share compared to the previous trading day's closing of $308.11 per share, erasing over $30.6 billion in market capitalization.

77.     In just over a month, UnitedHealth's stock price plummeted by 53.1%, or $310.69 per share, erasing over $281.8 billion in market capitalization.

### THE DIRECTOR DEFENDANTS CAUSE UNITEDHEALTH TO REPURCHASE ITS OWN STOCK AT INFLATED PRICES

78.     Despite their knowledge of the Company's deceptive billing scheme and their failure to ensure regulatory compliance, the Director Defendants approved multiple substantial stock repurchases at inflated prices.  While the price of UnitedHealth's stock was inflated prior to the disclosures revealing the extent of the Individual Defendants' misconduct, the Director Defendants caused UnitedHealth to repurchase 101,800,000 shares of common stock for $41,402,935,000, as detailed in the table below:

| Period | Repurchased Shares | Approximate Aggregate Cost |
|---|---|---|
| 3/31/2019 | 12,000,000 | $3,033,120,000 |
| 6/20/2019 | 6,000,000 | $1,414,620,000 |
| 9/30/2019 | 3,000,000 | $700,140,000 |
| 12/31/2019 | 1,600,000 | $410,480,000 |
| 3/31/2020 | 6,000,000 | $1,627,920,000 |
| 9/30/2020 | 3,000,000 | $911,280,000 |
| 12/31/2020 | 5,100,000 | $1,706,154,000 |
| 3/31/2021 | 5,000,000 | $1,727,100,000 |
| 6/30/2021 | 3,000,000 | $1,183,800,000 |
| 9/30/2021 | 2,000,000 | $828,460,000 |
| 12/31/2021 | 2,300,000 | $1,030,377,000 |
| 1/31/2022 | 1,000,000 | $472,200,000 |
| 2/28/2022 | 1,000,000 | $474,860,000 |
| 3/31/2022 | 3,000,000 | $1,482,300,000 |
| 4/30/2022 | 1,000,000 | $528,520,000 |
| 5/31/2022 | 2,000,000 | $985,940,000 |
| 6/30/2022 | 2,000,000 | $960,460,000 |

| | | |
|---|---|---|
| 7/31/2022 | 600,000 | $310,746,000 |
| 8/31/2022 | 700,000 | $377,482,000 |
| 9/30/2022 | 600,000 | $311,382,000 |
| 10/31/2022 | 700,000 | $363,657,000 |
| 11/30/2022 | 600,000 | $320,286,000 |
| 12/31/2022 | 600,000 | $320,136,000 |
| 1/31/2023 | 1,300,000 | $643,773,000 |
| 2/28/2023 | 1,500,000 | $727,830,000 |
| 3/31/2023 | 1,300,000 | $616,057,000 |
| 4/30/2023 | 1,200,000 | $599,988,000 |
| 5/31/2023 | 1,500,000 | $730,020,000 |
| 6/30/2023 | 3,500,000 | $1,665,965,000 |
| 7/31/2023 | 1,200,000 | $577,428,000 |
| 8/31/2023 | 1,000,000 | $501,090,000 |
| 9/30/2023 | 900,000 | $439,758,000 |
| 10/31/2023 | 1,000,000 | $524,300,000 |
| 11/30/2023 | 900,000 | $483,777,000 |
| 12/31/2023 | 900,000 | $490,347,000 |
| 1/31/2024 | 2,500,000 | $1,284,725,000 |
| 2/29/2024 | 1,700,000 | $876,996,000 |
| 3/31/2024 | 1,900,000 | $920,341,000 |
| 7/30/2024 | 100,000 | $57,153,000 |
| 8/31/2024 | 1,300,000 | $750,100,000 |
| 9/30/2024 | 200,000 | $119,206,000 |
| 10/31/2024 | 2,600,000 | $1,478,620,000 |
| 11/30/2024 | 900,000 | $534,051,000 |
| 12/31/2024 | 5,600,000 | $2,878,008,000 |
| 1/31/2025 | 2,200,000 | $1,155,154,000 |
| 2/28/2025 | 2,900,000 | $1,431,237,000 |
| 3/31/2025 | 900,000 | $435,591,000 |
| | | |
| **Total:** | **101,800,000.0** | **$41,402,935,000** |

79.     However, following the disclosure of the truth, the Company's stock closed at only $274.35—the market price at the close of trading on May 15, 2025.  This represents a significant decline to the $406.71 average price per share of the repurchases listed above.  The Individual Defendants and the Director Defendants caused UnitedHealth to repurchase $41,402,935,000, even though the true value of those shares was $27,928,830,000.  In sum, UnitedHealth overpaid by $14,134,235,000 for repurchases of its own stock at inflated prices.

## INSIDER SALES BY THE INSIDER SELLING DEFENDANTS

80.  Rather than providing the market with accurate information in a timely manner, the Insider Selling Defendants, used their knowledge of UnitedHealth's material, nonpublic information to sell their personal holdings while the Company's stock was artificially inflated.  As officers and directors of UnitedHealth, the Insider Selling Defendants were privy to material, nonpublic information about the Company's business operations.

81.  While in possession of this knowledge, defendant Hemsley sold 854,124 shares of his personally held UnitedHealth stock for proceeds of over $351.5 million.  On October 17, 2023, just a week after the Company received notification of the DOJ investigation, defendant Hemsley sold 121,515 shares of UnitedHealth common stock for proceeds of over $65.6 million.  Less than two months later, on December 5, 2023, defendant Hemsley sold another 66,081 shares of UnitedHealth common stock for proceeds of another $36 million.  Defendant Hemsley's sales were timed to maximize profit from UnitedHealth's then artificially inflated stock price.

82.  While in possession of this knowledge, defendant Burke sold 340,000 shares of his personally held UnitedHealth stock for proceeds of over $110.2 million.  Defendant Burke's sales were timed to maximize profit from UnitedHealth's then artificially inflated stock price.

83.  While in possession of this knowledge, defendant Witty sold 27,536 shares of his personally held UnitedHealth stock for proceeds of over $13.5 million.  Defendant Witty's sales were timed to maximize profit from UnitedHealth's then artificially inflated stock price.

84.  While in possession of this knowledge, defendant Ballard sold 22,000 shares of his personally held UnitedHealth stock for proceeds of over $5.5 million.  Defendant Ballard's sales were timed to maximize profit from UnitedHealth's then artificially inflated stock price.

85.     In sum, the Insider Selling Defendants sold over $480 million worth of stock at artificially inflated prices as detailed by the table below:

| Insider Last Name | Transaction Date | Shares | Price | Proceeds |
|---|---|---|---|---|
| **HEMSLEY**<br>**Current CEO, Chair of the Board and a Director** | 5/11/2020 | 45,637 | $289.11 | $13,194,021.80 |
| | 7/17/2020 | 170,000 | $307.74 | $52,315,800.00 |
| | 10/23/2020 | 75,000 | $329.35 | $24,700,950.00 |
| | 10/23/2020 | 23,579 | $329.86 | $7,777,863.26 |
| | 7/16/2021 | 60,000 | $420.62 | $25,237,110.00 |
| | 8/23/2021 | 70,000 | $426.30 | $29,841,154.00 |
| | 10/25/2021 | 30,014 | $44.04 | $1,321,906.60 |
| | 10/25/2021 | 29,471 | $448.97 | $13,231,447.52 |
| | 10/25/2021 | 13,515 | $449.76 | $6,078,533.43 |
| | 10/25/2021 | 50,000 | $455.57 | $22,778,700.00 |
| | 7/26/2022 | 99,312 | $534.27 | $53,059,223.62 |
| | 10/17/2023 | 121,515 | $540.58 | $65,688,590.85 |
| | 12/5/2023 | 66,081 | $550.39 | $36,370,196.04 |
| | | **854,124** | | **$351,595,497.10** |
| | | | | |
| **BURKE**<br>**Former Lead Independent Director** | 1/17/2019 | 15,000 | $260.55 | $3,908,259.00 |
| | 1/23/2019 | 11,500 | $268.00 | $3,082,000.00 |
| | 3/12/2019 | 5,000 | $245.01 | $1,225,055.00 |
| | 3/19/2019 | 5,000 | $257.32 | $1,286,583.50 |
| | 4/24/2019 | 10,000 | $229.75 | $2,297,501.00 |
| | 5/29/2019 | 10,000 | $241.99 | $2,419,883.00 |
| | 6/11/2019 | 10,000 | $248.00 | $2,480,000.00 |
| | 8/8/2019 | 5,000 | $246.40 | $1,232,000.00 |
| | 8/23/2019 | 2,000 | $231.50 | $463,000.00 |
| | 9/17/2019 | 2,500 | $232.76 | $581,897.00 |
| | 9/18/2019 | 2,500 | $232.60 | $581,500.00 |
| | 9/19/2019 | 2,500 | $233.40 | $583,500.00 |
| | 9/20/2019 | 2,500 | $234.20 | $585,500.00 |
| | 10/16/2019 | 25,000 | $236.56 | $5,914,015.00 |
| | 1/16/2020 | 15,000 | $299.45 | $4,491,750.00 |
| | 2/19/2020 | 10,000 | $306.04 | $3,060,385.00 |
| | 3/16/2020 | 5,000 | $237.00 | $1,185,000.00 |
| | 3/17/2020 | 10,000 | $240.10 | $2,401,037.00 |
| | 3/18/2020 | 5,000 | $212.00 | $1,060,000.00 |
| | 3/19/2020 | 5,000 | $224.40 | $1,122,000.00 |
| | 3/20/2020 | 10,000 | $228.39 | $2,283,921.00 |
| | 7/22/2020 | 10,000 | $303.50 | $3,035,017.00 |
| | 8/13/2020 | 15,000 | $320.59 | $4,808,820.00 |
| | 11/6/2020 | 700 | $349.31 | $244,516.02 |
| | 11/6/2020 | 4,300 | $350.35 | $1,506,520.05 |
| | 11/6/2020 | 5,000 | $349.41 | $1,747,064.00 |
| | 12/8/2020 | 7,000 | $349.78 | $2,448,443.90 |

| | | | |
|---|---|---|---|
| | 12/10/2020 | 2,500 | $342.00 | $855,000.00 |
| | 12/11/2020 | 3,000 | $336.50 | $1,009,500.00 |
| | 12/15/2020 | 2,500 | $340.00 | $850,000.00 |
| | 2/11/2021 | 5,000 | $335.80 | $1,678,992.00 |
| | 2/18/2021 | 2,500 | $326.99 | $817,463.75 |
| | 2/18/2021 | 1,250 | $327.36 | $409,194.50 |
| | 2/18/2021 | 1,250 | $329.07 | $411,336.88 |
| | 3/15/2021 | 4,000 | $353.33 | $1,413,300.00 |
| | 3/16/2021 | 6,000 | $354.90 | $2,129,418.60 |
| | 4/19/2021 | 2,500 | $391.25 | $978,125.00 |
| | 4/20/2021 | 2,500 | $391.25 | $978,125.00 |
| | 4/20/2021 | 10,000 | $395.43 | $3,954,250.00 |
| | 6/10/2021 | 2,000 | $402.00 | $804,000.00 |
| | 6/15/2021 | 4,000 | $400.25 | $1,601,000.00 |
| | 6/21/2021 | 4,000 | $398.63 | $1,594,500.00 |
| | 7/20/2021 | 8,000 | $414.31 | $3,314,440.00 |
| | 7/22/2021 | 7,000 | $415.70 | $2,909,867.10 |
| | 9/14/2021 | 2,500 | $416.75 | $1,041,875.00 |
| | 9/15/2021 | 10,000 | $418.06 | $4,180,625.00 |
| | 9/17/2021 | 2,500 | $419.00 | $1,047,500.00 |
| | 11/23/2021 | 2,500 | $444.70 | $1,111,750.00 |
| | 11/24/2021 | 2,500 | $450.00 | $1,125,000.00 |
| | 1/20/2022 | 5,000 | $469.41 | $2,347,044.00 |
| | 1/21/2022 | 4,000 | $468.50 | $1,874,000.00 |
| | 2/16/2022 | 5,000 | $476.72 | $2,383,587.50 |
| | 2/23/2022 | 4,000 | $465.30 | $1,861,182.40 |
| | 2/25/2022 | 6,000 | $470.38 | $2,822,305.20 |
| | 3/22/2022 | 4,000 | $511.14 | $2,044,567.60 |
| | 3/23/2022 | 3,000 | $505.67 | $1,517,001.00 |
| | 3/24/2022 | 3,000 | $508.80 | $1,526,400.00 |
| | 5/16/2022 | 2,500 | $493.25 | $1,233,125.00 |
| | 5/17/2022 | 2,500 | $493.50 | $1,233,750.00 |
| | 5/19/2022 | 2,500 | $478.96 | $1,197,410.50 |
| | | **340,000** | | **$110,290,803.50** |
| | | | | |
| **WITTY** Former CEO and a Director | 7/21/2021 | 6,000 | $414.15 | $2,484,900.00 |
| | 7/18/2022 | 11,376 | $527.90 | $6,005,390.40 |
| | 4/27/2023 | 6,160 | $487.49 | $3,002,949.49 |
| | 7/19/2023 | 4,000 | $506.19 | $2,024,760.00 |
| | | **27,536** | | **$13,517,999.89** |
| | | | | |
| **BALLARD** Former Director | 1/22/2019 | 5,000 | $266.61 | $1,333,035.00 |
| | 5/6/2019 | 5,000 | $239.02 | $1,195,120.00 |
| | 7/23/2019 | 12,000 | $255.31 | $3,063,660.00 |
| | | **22,000** | | **$5,591,815.00** |
| | | | | |
| | | | | |
| | | **1,243,660** | | **$480,996,115.49** |

**DAMAGES TO UNITEDHEALTH**

86.     As a result of the Individual Defendants' improprieties, UnitedHealth engaged in a deceptive billing scheme to inflate its Medicare reimbursements.  The Individual Defendants failed to disclose material information concerning the Company's MA operations and its noncompliance with applicable regulatory standards, thereby exposing the Company to substantial litigation risk, heightened government scrutiny, and significant reputational harm.  These issues have severely undermined UnitedHealth's credibility, leading to a loss of hundreds of billions of dollars in market capitalization.

87.     UnitedHealth's performance issues also damaged its reputation within the business community and in the capital markets.  In addition to price, UnitedHealth's current and potential customers are less likely to invest in companies that engage in unethical business practices and fail to comply with regulatory standards.  UnitedHealth's ability to raise equity capital or debt on favorable terms in the future is now impaired.  Moreover, the Company stands to incur higher marginal costs of capital and debt, as the deceptive practices committed by the Individual Defendants have materially increased the perceived risks of investing in and lending money to the Company.

88.     Further, as a direct and proximate result of the Individual Defendants' actions, UnitedHealth has expended, and will continue to expend, significant sums of money.  Such expenditures include, but are not limited to:

      (a)     costs incurred in complying with the DOJ criminal investigation;

      (b)     costs incurred from any internal investigations;

      (c)     costs incurred in repurchasing its own stock at inflated prices;

(d)      costs incurred to correct the Company's inadequate compliance systems to prevent deceptive billing practices; and

(e)      costs incurred from compensation and benefits paid to the defendants who have breached their duties to UnitedHealth.

## DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

89.      Plaintiff brings this action derivatively in the right and for the benefit of UnitedHealth to redress injuries suffered, and to be suffered, by UnitedHealth as a direct result of the Individual Defendants' violations of securities law, breach of fiduciary duty, and unjust enrichment.  UnitedHealth is named as a nominal defendant solely in a derivative capacity.

90.      Plaintiff will adequately and fairly represent the interests of UnitedHealth in enforcing and prosecuting its rights.

91.      Plaintiff was a stockholder of UnitedHealth at the time of the wrongdoing complained of, has continuously been a stockholder since that time, and is a current UnitedHealth stockholder.

92.      The current Board of UnitedHealth consists of the following nine individuals: defendants Hemsley, Hooper, Flynn, Rice, McNabb, Noseworthy, Garcia, Gil, and Baker.  Plaintiff has not made any demand on the present Board to institute this action because such a demand would be a futile, wasteful, and useless act, as set forth below.

**Demand Is Excused Because Defendants Hemsley, Hooper, Flynn, Rice, McNabb, Noseworthy, Garcia, Gil, and Baker Face a Substantial Likelihood of Liability for Their Misconduct**

93.      As alleged above, defendants Hemsley, Hooper, Flynn, Rice, McNabb, Noseworthy, Garcia, Gil, and Baker breached their fiduciary duties of loyalty and violated the Company's Code by approving or permitting the deceptive Medicare billing practices and failing to ensure compliance with applicable regulatory requirements.  The Board's knowledge and

approval of the Company's upcoding practices are evident in light of longstanding red flags—for instance, the UnitedHealth False Claims Act Case filed against the Company in 2016. This lawsuit directly challenges the Company's upcoding practices, that continued to generate substantial revenue. The UnitedHealth False Claims Act Case was repeatedly disclosed in the Company's Annual Reports—documents reviewed and signed by defendants Hemsley, Hooper, Flynn, Rice, McNabb, Noseworthy, Garcia, Gil, and Baker—making clear they were fully aware of UnitedHealth's upcoding practices. Despite this ongoing litigation and mounting regulatory and media scrutiny, defendants Hemsley, Hooper, Flynn, Rice, McNabb, Noseworthy, Garcia, Gil, and Baker continued to allow UnitedHealth to engage in deceptive upcoding practices for years thereafter.

94.     Additionally, defendants Hemsley, Hooper, Flynn, Rice, McNabb, Noseworthy, Garcia, Gil, and Baker caused or approved UnitedHealth's repurchases totaling over $41.4 billion of its stock at a time when they knew, or with reckless indifference did not know, that the Company's stock price was inflated due to the undisclosed issues described herein, causing the Company to overpay by $14.1 billion. Thus, defendants Hemsley, Hooper, Flynn, Rice, McNabb, Noseworthy, Garcia, Gil, and Baker face a substantial likelihood of liability for their breaches of fiduciary duty and violation of securities law.

95.     The Audit Committee's Charter provides that the Audit Committee is responsible for compliance with legal and regulatory requirements. Thus, defendants Hooper, McNabb, Garcia, Gil, and Baker as members of the Audit Committee, were responsible for knowingly or recklessly allowing the Company's deceptive Medicare scheme to persist. Accordingly, defendants Hooper, McNabb, Garcia, Gil, and Baker breached their fiduciary duty of loyalty by participating in, and failing to prevent, the wrongdoing described herein. Thus, defendants

Hooper, McNabb, Garcia, Gil, and Baker face a substantial likelihood of liability for their breach of fiduciary duties, rendering any demand upon them futile.

96.     Defendants Hemsley, Hooper, Flynn, Rice, McNabb, and Noseworthy are responsible for issuing UnitedHealth's materially misleading proxy statements.  It is against public policy to indemnify individuals for violations of section 14(a) of the Exchange Act and Rule 14a-9 promulgated thereunder.  As such, any indemnification provided by the Company to defendants Hemsley, Hooper, Flynn, Rice, McNabb, and Noseworthy does not protect them for violations of section 14(a) of the Exchange Act and Rule 14a-9 promulgated thereunder in the Company's proxy statements.  Accordingly, defendants Hemsley, Hooper, Flynn, Rice, McNabb, and Noseworthy face a substantial likelihood of liability, thereby excusing demand.

**Additional Reasons Why Demand on Defendant Hemsley Is Futile**

97.     Defendant Hemsley sold UnitedHealth stock under highly suspicious circumstances.  Defendant Hemsley as CEO and a director, possessed material, nonpublic UnitedHealth information and used that information to benefit himself.  Defendant Hemsley sold stock based on this knowledge of material, nonpublic information regarding UnitedHealth's Medicare Advantage operations, the Company's failure to ensure regulatory compliance, and the impending decrease in the value of their holdings of UnitedHealth.  Accordingly, defendant Hemsley faces a substantial likelihood of liability for breach of his fiduciary duty of loyalty. Demand is futile as to defendant Hemsley.

## FIRST CLAIM

**Against the Individual Defendants for Violation of Section 10(b) of the Exchange Act and SEC Rule 10b-5 Promulgated Thereunder**

98.     Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

99.     During the period of wrongdoing, the Individual Defendants, knowingly or recklessly failed to disclose material information concerning UnitedHealth's deceptive Medicare billing practices and the Company's ongoing noncompliance with regulatory standards. These material omissions misled investors and the public, allowing the Company's stock to trade at artificially inflated prices.

100.    While in possession of material, nonpublic information regarding the Company's unlawful Medicare billing practices and regulatory exposure, the Director Defendants caused the Company to repurchase shares of its own common stock at artificially inflated prices. The Director Defendants engaged in a scheme to defraud UnitedHealth by causing the Company to repurchase $41,402,935,000 in shares of its own stock at artificially inflated prices.

101.    The Individual Defendants violated section 10(b) of the Exchange Act and SEC Rule 10b-5 in that they: (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material facts or omitted to state material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading; and/or (iii) engaged in acts, practices, and a course of business that operated as a fraud or deceit upon UnitedHealth in connection with the Company's repurchases of its own stock during the period of wrongdoing.

102.    The Individual Defendants, individually and collectively, directly and indirectly, by the use of means or instrumentalities of interstate commerce or of the mail: (i) engaged and participated in a continuous course of conduct that operated as a fraud and deceit upon the Company; (ii) omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; (iii) omitted the material facts described above intentionally or with a severely reckless disregard for the truth; and

(iv) employed devices, and artifices to defraud in connection with the purchase and sale of UnitedHealth stock, which were intended to, and did: (a) deceive UnitedHealth and its stockholders regarding, among other things, the Company's MA operations and the Company's failure to ensure regulatory compliance; (b) artificially inflate and maintain the market price of UnitedHealth's stock; and (c) cause UnitedHealth to repurchase the Company's stock at artificially inflated prices and suffer losses when the true facts became known.  Throughout the period of wrongdoing, the defendants were in possession of material nonpublic information regarding the above.

103.    The Individual Defendants were among the senior management and directors of the Company, and were therefore directly responsible for, and are liable for, all omissions of material facts made during the period of wrongdoing, as stated above.

104.    The Individual Defendants acted with scienter throughout the period of wrongdoing, in that they acted either with intent to deceive, manipulate, or defraud, or with severe recklessness.  The omissions of material facts set forth in this Complaint were either known to the Individual Defendants or were so obvious that the defendants should have been aware of them. Throughout the period of wrongdoing, the defendants also had a duty to disclose new information that came to their attention and rendered their prior statements to the market materially false or misleading.

105.    The Individual Defendants' omissions of material facts were made in connection with the repurchases of UnitedHealth stock by the Company.

106.    Plaintiff, on behalf of UnitedHealth, has no adequate remedy at law.

## SECOND CLAIM

**Against Defendants Hemsley, Hooper, Flynn, Rice, McNabb, Noseworthy, Burke, Witty, Ballard, Renwick, and Wichmann for Violation of Section 10(b) of the Exchange Act and SEC Rule 10b-5 Promulgated Thereunder**

107.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

108.    Rule 14a-9, promulgated pursuant to section 14(a) of the Exchange Act, provides that no proxy statement shall contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary to make the statements therein not false or misleading."  17 C.F.R. §240.14a-9(a).

109.    Defendants Hemsley, Hooper, Flynn, Rice, McNabb, Noseworthy, Burke, Ballard, Renwick, and Wichmann issued, caused to be issued, and participated in the issuance of the Company's materially misleading 2020 Proxy Statement on Form DEF 14A, filed with the SEC on April 17, 2020 (the "2020 Proxy") to stockholders, which omitted material facts necessary to make the statements therein not misleading.   The 2020 Proxy contained a proposal to the Company's stockholders to approve the 2020 Stock Incentive Plan.  The 2020 Proxy, however, misstated or failed to disclose that: (i) UnitedHealth engaged in an aggressive billing scheme, often based on incomplete or unsupported diagnoses, in order to maximize profit; (ii) the Company's business practices were not in compliance with regulatory standards.

110.    Next, defendants Hemsley, Hooper, Flynn, Rice, McNabb, Noseworthy, Burke, Witty, and Renwick issued, caused to be issued, and participated in the issuance of the Company's materially misleading 2021 Proxy Statement on Form DEF 14A, filed with the SEC on April 26, 2021 (the "2021 Proxy") to stockholders, which omitted material facts necessary to make the statements therein not misleading.   The 2021 Proxy contained a proposal to the Company's

stockholders to approve an amendment to the Company's 1993 Employee Stock Purchase Plan. The 2021 Proxy, however, misstated or failed to disclose that: (i) UnitedHealth engaged in an aggressive billing scheme, often based on incomplete or unsupported diagnoses, in order to maximize profit; (ii) the Company's business practices were not in compliance with regulatory standards.

111.    By reasons of the conduct alleged herein, defendants Hemsley, Hooper, Flynn, Rice, McNabb, Noseworthy, Burke, Witty, Ballard, Renwick, and Wichmann violated section 14(a) of the Exchange Act and Rule 14a-9 promulgated thereunder. As a direct and proximate result of these violations, UnitedHealth's stockholders voted to approve a stock incentive plan and an amendment to the Company's 1993 Employee Stock Purchase Plan.

112.    Plaintiff, on behalf of UnitedHealth, hereby seeks relief for damages inflicted upon the Company in connection with the approval of the 2020 Stock Incentive Plan and the amendment of the 1993 Employee Stock Purchase Plan, based upon the misleading proxy statements, and also seeks appropriate corrective disclosures.

## THIRD CLAIM

### Against the Individual Defendants for Breach of Fiduciary Duty

113.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

114.    The Individual Defendants owed and owe UnitedHealth fiduciary obligations. By reason of their fiduciary relationships, the Individual Defendants owed and owe UnitedHealth the highest obligation of care and loyalty.

115.    The Individual Defendants and each of them, violated and breached their fiduciary duties.

116.    The Officer Defendant either knew, was reckless, or was grossly negligent in disregarding misconduct of such substantial magnitude and duration.  The Officer Defendant either knew, was reckless, or was grossly negligent in not knowing that UnitedHealth operated a deceptive Medicare billing scheme and was not in compliance with applicable regulatory standards.  Accordingly, the Officer Defendant breached his duty of care and loyalty to the Company.

117.    The Director Defendants, as directors of the Company, owed UnitedHealth the highest duty of loyalty.  These defendants breached their duty of loyalty through their failure to: (i) disclose material information regarding UnitedHealth's MA operations and the Company's failure to ensure regulatory compliance; and (ii) implement and maintain adequate compliance systems to ensure the Company did not engage in deceptive billing practices.  Accordingly, these defendants breached their duty of loyalty to the Company.

118.    The Audit Committee Defendants breached their fiduciary duty of loyalty by approving the misconduct described herein which were made during their tenure on the Audit Committee, which they knew or were reckless in not knowing about the Company's deceptive business practices and regulatory noncompliance.  The Audit Committee Defendants completely and utterly failed in their duty of oversight, as required by the Audit Committee Charter in effect at the time.

119.    The Insider Selling Defendants breached their duty of loyalty by selling UnitedHealth stock on the basis of the knowledge of the misconduct described above before that information was revealed to the Company's stockholders.  The information described above was material, nonpublic information concerning the Company's business operations.   It was a

proprietary asset belonging to the Company, which the Insider Selling Defendants used for their own benefit when they sold UnitedHealth common stock.

120.    As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations, UnitedHealth has sustained significant damages, as alleged herein.  As a result of the misconduct alleged herein, these defendants are liable to the Company.

121.    Plaintiff, on behalf of UnitedHealth, has no adequate remedy at law.

## FOURTH CLAIM

### Against the Individual Defendants for Unjust Enrichment

122.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

123.    By their wrongful acts and omissions, the Individual Defendants were unjustly enriched at the expense of and to the detriment of UnitedHealth.  The Individual Defendants were unjustly enriched as a result of the compensation and director remuneration they received while breaching fiduciary duties owed to UnitedHealth.

124.    The Insider Selling Defendants sold UnitedHealth stock while in possession of material, nonpublic information that artificially inflated the price of UnitedHealth stock.  As a result, the Insider Selling Defendants profited from their misconduct and were unjustly enriched through their exploitation of material and adverse inside information.

125.    Plaintiff, as a stockholder and representative of UnitedHealth, seeks restitution from these defendants, and each of them, and seeks an order of this Court disgorging all profits, benefits, and other compensation obtained by these defendants, and each of them, from their wrongful conduct and fiduciary breaches.

126.    Plaintiff, on behalf of UnitedHealth, has no adequate remedy at law.

## PRAYER FOR RELIEF

WHEREFORE, plaintiff, on behalf of UnitedHealth, demands judgment as follows:

A.    Against all of the defendants and in favor of the Company for the amount of damages sustained by the Company as a result of the defendants' violations of securities law, breach of fiduciary duties, and unjust enrichment;

B.    Directing UnitedHealth to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect UnitedHealth and its stockholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for stockholder vote, resolutions for amendments to the Company's Bylaws or Articles of Incorporation and taking such other action as may be necessary to place before stockholders for a vote of the following corporate governance policies:

1.    a proposal to strengthen the Board's supervision of operations, including Medicare billing practices;

2.    a proposal to strengthen the Company's controls over regulatory compliance;

3.    a proposal to control insider selling and claw back profits in the event improper insider selling is discovered;

4.    a proposal to strengthen UnitedHealth's oversight of stock repurchases;

5.    a proposal to develop and implement procedures for greater stockholder input into the policies and guidelines of the Board; and

6.    a provision to permit the stockholders of UnitedHealth to nominate at least three candidates for election to the Board;

C.      Extraordinary equitable and/or injunctive relief as permitted by law, equity, and state statutory provisions sued hereunder, including attaching, impounding, imposing a constructive trust on, or otherwise restricting the proceeds of defendants' trading activities or their other assets so as to assure that plaintiff on behalf of UnitedHealth has an effective remedy;

D.      Awarding to UnitedHealth restitution from defendants, and each of them, and ordering disgorgement of all profits, benefits, and other compensation obtained by the defendants, including all ill-gotten gains from insider selling by defendants;

E.      Awarding to plaintiff the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

F.      Granting such other and further relief as the Court deems just and proper.

### **JURY DEMAND**

Plaintiff demands a trial by jury.

Dated: June 30, 2025                     GEORGE FELDMAN MCDONALD, PLLC

                                          *s/ Rebecca A. Peterson*
                                          Rebecca A. Peterson (#0392663)
                                          Catherine A. Peterson (#0505172)
                                          Krista K. Freier (#0390223)
                                          1650 W. 82nd Street, Suite 880
                                          Bloomington, MN 55431
                                          Telephone: (888) 421-4173
                                          Facsimile: (612) 778-9595
                                          E-mail: rpeterson@4-justice.com
                                                  cpeterson@4-justice.com
                                                  kfreier@4-justice.com

ROBBINS LLP
Brian J. Robbins
Craig W. Smith
Shane P. Sanders
5060 Shoreham Place, Suite 300
San Diego, CA 92122
Telephone: (619) 525-3990
Facsimile: (619) 525-3991
E-mail: brobbins@robbinsllp.com
        csmith@robbinsllp.com
        ssanders@robbinsllp.com

Attorneys for Plaintiff

1698279

## VERIFICATION

I, Joseph Crognale, hereby declare as follows:

I am the plaintiff in this action.  I have read the verified stockholder derivative complaint. Based upon discussions with and reliance upon my counsel, and as to those facts of which I have personal knowledge, the complaint is true and correct to the best of my knowledge, information, and belief.

I declare under penalty of perjury that the foregoing is true and correct.

Signed and Accepted:

Dated: 6/25/2025 _____

DocuSigned by:

*Joseph Crognale*

68452AE7D25B4F9...

_____
JOSEPH CROGNALE